**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
------------------------------------------------------------------X

MARCIA A. GOMEZ,

        Plaintiff,

   - against -             **REPORT AND**
                      **RECOMMENDATION**

NATIONAL FINANCIAL NETWORK, INC. and  CV 20-1968 (GRB) (AKT)
WILLIAM KATZ,

        Defendants.

------------------------------------------------------------------X

**A. KATHLEEN TOMLINSON, Magistrate Judge:**

I.  <u>PRELIMINARY STATEMENT</u>

   Plaintiff Marcia A. Gomez ("Plaintiff") commenced this action pursuant to Title VII, the

Fair Labor Standards Act ("FLSA"), the New York State Human Rights Law ("NYSHRL"), and

New York Labor Law ("NYLL") against Defendants National Financial Network, Inc. ("NFN")

and William Katz ("Katz," together with NFN, the "Defendants").  *See generally* Complaint

("Compl.") [DE 1].  Defendant NFN moves to dismiss Counts Three, Four, and Five of the

Complaint pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6).  *See generally*

Memorandum of Law in Support of Motion to Dismiss ("Def. NFN's Mem.") [DE 21].

Specifically, NFN seeks dismissal of Plaintiff's claims arising under the FLSA and NYLL for

failure to pay overtime and the NYLL claim for failure to provide accurate wage statements.  *See*

*id.* at 1.  None of Plaintiff's FLSA and NYLL claims are asserted against Defendant Katz.

   Plaintiff opposes NFN's motion and contends that she should be granted leave to amend

the Complaint.  *See generally* Plaintiff's Memorandum of Law in Opposition to Defendant's

Partial Motion to Dismiss ("Pl.'s Opp'n") [DE 23].  Defendant NFN filed a reply.  *See generally*

Reply Memorandum of Law in Further Support of Motion to Dismiss ("Def. NFN's Reply") [DE 21].

The Honorable Sandra J. Feuerstein[1] referred Defendant NFN's motion to this Court for a Report and Recommendation as to whether the motion should be granted.  *See* September 28, 2020 Electronic Order.  For the reasons which follow, this Court respectfully recommends to Judge Brown that Defendant NFN's motion to dismiss be GRANTED.

II.    BACKGROUND

    A.    **Factual Background**

The following factual allegations have been taken from the Complaint.  All facts alleged by Plaintiff are assumed to be true for purposes of deciding the motion to dismiss and are construed in a light most favorable to Plaintiff as the non-moving party.  *See, e.g.*, *Tanvir v. Tanzin*, 894 F.3d 449, 458 (2d Cir. 2018); *LaFaro v. N.Y. Cardiothoracic Grp.*, 570 F.3d 471, 475 (2d Cir. 2009); *McGrath v. Bayer HealthCare Pharms. Inc.*, 393 F. Supp. 3d 161, 166 (E.D.N.Y. 2019); *Matthews v. City of N.Y.*, 889 F. Supp. 2d 418, 425 (E.D.N.Y. 2012).

        *1.    Events Leading to Plaintiff's Employment with NFN*

Plaintiff, a New York resident, began working in the financial services industry in 2011 as an insurance agent.  *See* Compl. ¶¶ 8, 18.  She received her series 7 license in 2013 and began working as a financial advisor.  *Id.* ¶ 19.  Defendant NFN is a New York corporation  which maintains its principal place of business at 990 Stewart Avenue, Suite 200, Garden City, New York 11530.  *See id.* ¶ 10.  Defendant NFN is a prominent financial services firm that provides comprehensive business, personal, and corporate financial strategies.  *Id.* ¶ 20.  Plaintiff

---

        [1]    Judge Feuerstein presided over this matter up until her untimely death, after which this case was reassigned to Judge Brown.

interviewed for a financial advisor position at Defendant NFN in 2013, but chose to accept a job at a different financial company at that time.  *Id.*

In 2017, Michael Maresca, an Associate General Agent of Defendant NFN, contacted Plaintiff about a new job opening at NFN.  *Id.* ¶ 22.  Maresca remembered Plaintiff from her prior interview in 2013 and thought she would be a great fit for the position, which would involve working with Defendant Katz.  *Id.*  Maresca spoke highly of Katz's business acumen. He also mentioned that Katz was planning to retire in a few years and that the position could lead to Plaintiff taking over Katz's book of business upon his retirement.  *See id.*  Plaintiff then went to the NFN office to meet and observe Katz.  *Id.* ¶ 24.  Katz told Plaintiff about his financial advisor practice, that he was looking for a new hire, and that his book of business "mostly consisted of selling life insurance products and that he needed someone to provide clients with financial planning."  *Id.*  If Katz's clients began to trust Plaintiff's advice, Katz said he could expand his business by adding a fee for Plaintiff's consultation services.  *Id.*  At some point during the meeting, Katz told Plaintiff that he "'works better' with women" and that he had already interviewed two other women and one man for the job.  *Id.* ¶ 25.

Shortly after the interview, Defendants offered the job to Plaintiff.  *Id.* ¶ 26.  She was promised that Katz would mentor and groom her to take over his business when he retired and that she would have access to his current clientele to whom she would provide financial planning services.  *Id.*  The compensation package offered to Plaintiff by NFN included:

- "Fixed compensation of $10,000 per month that consisted of two draws. A draw is a 'salary' that an employee receives regularly . . . but is really an advance on future earnings.  The employee receiving the draw has to pay back the draw once the employee "earns" the money.  Ms. Gomez had two draws a month, one for $5,000 per month from Guardian Life Insurance which would be paid back from commissions she earned selling Guardian Life Insurance and Disability Products and one for $5,000 per month from Defendant NFN."  *Id.* ¶ 28(a).

3

- "Commissions based on the insurance and financial planning products that Ms. Gomez and Defendant Katz sold, which were to be split according to an agreement between her and Defendant Katz." *Id.* ¶ 28(b).

Regarding commissions, Plaintiff and Katz split commissions on investment and financial products "50/50." *Id.* ¶ 31. Then as to life insurance, commissions "would be split according to whose client or referral it was meaning if it was an existing client of Defendant Katz, Ms. Gomez would receive 30%; however, if Ms. Gomez brought the client in, the split would be 50/50." *Id.* Plaintiff chose not to pursue a signing bonus because when she inquired about one to Maresca, he seemed shocked that she would even ask for additional compensation. *Id.* ¶ 32. Notwithstanding that circumstance, and due to the promises made to her, Plaintiff accepted the position and began working for NFN on November 16, 2017 as a financial advisor. *Id.* ¶¶ 33-34. Her job was (a) to sell Guardian Life Insurance products and financial investment products to Katz's clients and (b) to obtain new referrals for her and Katz. *Id.* ¶ 35.

## 2. *Interactions between Plaintiff and Katz*

The bulk of the allegations in the Complaint pertain to several incidents in which Plaintiff claims to have been sexually harassed by Katz. These incidents began quickly after Plaintiff started working at NFN. *Id.* ¶ 36. Within their first few conversations, Katz showed Plaintiff a picture of his children and informed Plaintiff that he had been going through a divorce for the last two years. *Id.* Plaintiff's office was located three doors down from Katz's; however, two to three weeks after Plaintiff's employment began, Katz requested that Plaintiff's office be moved next to his. *Id.* ¶ 37. This required a far more senior employee to change offices which made Plaintiff uncomfortable. *Id.* Despite the new office arrangement, Katz constantly called Plaintiff into his office and "would quickly move from discussing clients to making nasty personal

statements about his wife and their sex life." *Id.* ¶ 38.  Katz told Plaintiff that he had a girlfriend who had been his masseuse for many years prior to the start of their relationship. *Id.* ¶ 39.  He also made self-deprecating comments about his height, weight, and age and would look at Plaintiff expectantly to placate him. *Id.* ¶ 40.

In late November 2017, the end of the first month of Plaintiff's employment, Katz asked Plaintiff to go to his house one night to review files with him. *Id.* ¶ 41.  Based on Plaintiff's prior jobs in the financial services industry, she knew this request was outside the norm. *Id.* ¶ 42.  She decided to go because she did not want to seem unmotivated by refusing to work in the evening. *Id.* ¶ 43.  Before she arrived, Katz asked what she wanted for dinner. *Id.* ¶ 44. When she got to his home, he was alone, ordered sushi for her, and tried to persuade her to drink alcohol. *Id.*  She ate the food but declined the alcohol because she felt uncomfortable drinking during a work meeting. *Id.*  The information that Katz planned to discuss with her was information that they had reviewed earlier when they were in the office. *Id.*

At an unspecified time, Katz scheduled a last-minute appointment for Plaintiff to meet with a new financial planning client. *Id.* ¶ 46.  This meeting was scheduled at the same time Plaintiff needed to pick up her daughter from school. *Id.*  Katz knew that Plaintiff did not have anybody else to pick up her daughter and then offered to get Plaintiff's daughter from school himself and take her to dance class. *Id.* ¶¶ 46-47.  Plaintiff hesitated but said yes to Katz's offer because she could not say "no" to meeting a potential new client. *Id.* ¶ 48.

Shortly after the first meeting at his home, Katz asked Plaintiff to go back to his home for a second nighttime meeting. *Id.* ¶ 49.  Afterwards, these nighttime work meetings at Katz's home began to occur more frequently, between one and two times per week. *Id.* ¶ 50.  Plaintiff claims there was never much work to be done during these meetings because the work they

normally performed, which consisted of reviewing a file, could have taken them 20 minutes to do at the office. *Id.* At each of these home meetings, Katz would order dinner and ask Plaintiff to drink alcohol. *Id.* This made Plaintiff uncomfortable, but she felt she had to eat and drink because she was new to NFN and Katz was her boss. *Id.* She became concerned about Katz's motives but thought he needed company to get him through his divorce. *Id.*

At a mid-December 2017 meeting at his home, Katz asked Plaintiff to enter his living room and sit down. *Id.* ¶ 52. He then proceeded to tell Plaintiff how he felt about her, that she was beautiful, and that he wanted to have a romantic and sexual relationship with her. *Id.* Plaintiff did not reciprocate his feelings and she was horrified upon hearing Katz's revelation. *Id.* She did not want to reject him outright because doing so could impact her job and ability to support her daughter and mother. *Id.* Unsure of what to say, Plaintiff said she needed to pick up her broken cell phone at a store and she rushed out of Katz's home. *Id.* Throughout Plaintiff's employment with NFN, she never heard of any other employees being asked to work at Katz's home. *Id.* ¶ 51.

After Katz confessed his feelings to Plaintiff in December 2017, he began making inappropriate comments to her. *Id.* ¶ 53. He routinely called her after work hours from his home and told her he was taking bubble baths while they talked. *Id.* ¶ 54. He told Plaintiff many details about his sex life and mentioned how many times per day and per week he could have sex. *Id.* ¶ 55. He also told Plaintiff stories about his girlfriend and explained that she "came onto him" while she was working as a masseuse and made the massages increasingly erotic. *Id.* ¶ 56. Plaintiff tried to re-direct their conversations back to work-related topics but Katz insisted on commenting about Plaintiff's appearance and discussing his sex life. *Id.* ¶ 57. As a result, Plaintiff became more self-conscious and "toned down her appearance." *Id.* ¶ 58. For example,

instead of wearing her hair up she wore it down, and Katz looked at her unhappily and expressed

that he was not sure if he liked her hair that way.  *Id.*  Plaintiff also wore lipstick and Katz told

her that he did not like the color.  *Id.* ¶ 59.

On January 5, 2018, Katz called Plaintiff after work to inform her that he served his wife

with divorce papers and wanted to celebrate.  *Id.* ¶ 60.  Plaintiff declined the invitation and

encouraged Katz to celebrate with his girlfriend.  *Id.* ¶ 61.  Katz became angry and insisted on

celebrating with Plaintiff, which made Plaintiff believe her job was in jeopardy if she did not do

so.  *Id.*  She ultimately agreed to go and despite insisting on driving herself, Katz wanted to pick

her up at her home and then take her to dinner.  *Id.*  When Katz arrived at Plaintiff's home,

Plaintiff was upstairs so her mother let him in.  *Id.* ¶ 62.  Plaintiff then came downstairs and saw

Katz lying on her living room couch with a bottle of champagne.  *Id.*  She thought this was

inappropriate but felt pressured to serve him the champagne.  *Id.*  She and Katz left for dinner

after having one glass of champagne.  *Id.*

While at dinner, Katz again conveyed to Plaintiff that he had strong romantic feelings for

her and told her that he planned to break up with his girlfriend.  *Id.* ¶ 63.  Plaintiff delicately

explained to Katz that she was not romantically interested in him and that he should not break up

with his girlfriend.  She asked him to "put his feelings in a box" because they were colleagues.

*Id.* ¶ 64.  Reiterating that they were colleagues, Plaintiff told him she appreciated him as a boss

and mentor.  *Id.*  Katz put his head down and said, "If that's what you need, I'll do that."  *Id.*

After dinner, Katz drove Plaintiff home.  *Id.* ¶ 65.  When they got to her house, Plaintiff said

goodbye to him and "went to give him a hug and a peck on the cheek goodbye as she usually did

when they were meeting outside the office and as is customary in her culture.  *Id.*  Katz turned

his head and kissed Plaintiff on the lips.  *Id.*  Plaintiff quickly pulled away and got out of Katz's

car.  *Id.*  He then followed Plaintiff and chased her to her front door.  *Id.*  When Plaintiff was looking for her keys and facing her door, Katz touched her lower back as if he was about to kiss Plaintiff again.  *Id.* ¶ 66.  Plaintiff pulled away from him, opened her door and closed it in his face.  *Id.*  This incident left Plaintiff so distraught and horrified that she felt she could not go to work the for the next several days.  *Id.* ¶¶ 67-68.

After Plaintiff returned to work, she was very formal with Katz; however, her lack of romantic interest in him seemed to inspire him to pursue her more aggressively and also to sexually harass her.  *Id.* ¶ 69.  Katz began to call Plaintiff "Mrs. Katz" on the phone and when they had meetings in the office.  *Id.* ¶ 70.  He also continued to make inappropriate comments towards Plaintiff "and became more blatant about his quid pro quo offers" (*i.e.*, if she was "with" someone like him, she would not have to worry about her daughter's college tuition).  *Id.* ¶ 71.  Katz also told Plaintiff that he would buy her a mansion and that she would not have to worry about the percentages of their commission split.  *Id.* ¶ 72.

Later on in January 2018, NFN held its annual company gala.  *Id.* ¶ 73.  Katz told Plaintiff that he asked for the two of them to be seated next to each other with NFN's CEO, Anthony Mazzei.  *Id.*  Plaintiff then called Maresca and told him that Katz confessed his feelings for her and was making her very uncomfortable.  *Id.* ¶ 74.  Maresca laughed.  Plaintiff told him that Katz was treating her like his girlfriend or lover instead of his employee, and that she was concerned about sitting next to Katz at the gala.  *Id.* ¶¶ 74-75.  Maresca told Plaintiff that he would arrange for her to sit at a different table and quickly ended the call.  *Id.* ¶ 76.  At the gala, Plaintiff sat at a different table from Katz.  *Id.* ¶¶ 77.  However, Katz "behaved as if he owned [Plaintiff]" and repeatedly humiliated her.  *Id.*  While Plaintiff was speaking with another co-worker, Eric Bousilka, about ways to expand her business, Katz approached her angrily.

*Id.* ¶ 78.  He wanted to know whether Bousilka was "hitting on her," and Plaintiff informed Katz that they were discussing work opportunities.  *Id.*

Plaintiff was scheduled to have surgery in Colombia in February 2018.  *Id.* ¶ 80. Throughout the month prior to her surgery, Katz told Plaintiff that he was worried about her going there alone.  *Id.* ¶ 81.  Katz called and demanded to go to Colombia with her because he would be unable to work if he was worried about her safety and because he wanted to protect her.  *Id.* ¶ 82.  After Plaintiff told him no, Katz said Plaintiff's career could be compromised if she left for two weeks because she would miss many meetings and potential business.  *Id.* Plaintiff hung up the phone and then called her friend Natasha to express her concerns about Katz's demand to accompany her to Colombia and fears of losing her job.  *Id.* ¶¶ 83-84.  After speaking to Natasha, Plaintiff called Maresca again to inform him that Katz demanded to go to Colombia with her and to express her concerns about being alone with Katz for two weeks in another country.  *Id.* ¶ 85.  Maresca laughed in response.  *Id.*  Knowing Maresca was not going to help her handle this situation, if Plaintiff wanted to keep her job, she "was absolutely stuck with Defendant Katz traveling to Columbia."  *Id.* ¶ 86.  Plaintiff was able to convince Katz to shorten his stay in Colombia to a weekend instead of two weeks.  *Id.*

Ultimately, Katz did not go to Colombia but insisted on picking up Plaintiff's daughter from school and driving her to dance class while Plaintiff was away.  *Id.* ¶¶ 88-89.  Plaintiff allowed Katz to do so on the days her brother could not pick up her daughter.  *Id.* ¶ 89.  When Plaintiff told Katz he could help with this, he called her "Mrs. Katz" again.  *Id.*  While Plaintiff was in Colombia, Katz tried to take Plaintiff's mother to dinner and to the supermarket, but Plaintiff's family said that was unnecessary.  *Id.* ¶¶ 91-92.  Plaintiff told Katz that she did not need to be picked up at the airport when she returned on February 22, 2018.  *Id.* ¶ 93.  However,

Katz hired a limousine, picked up Plaintiff's daughter at Plaintiff's home, and then took the limo to meet Plaintiff at the airport. *Id.*

Two days later, on February 24, 2018, Katz asked Plaintiff to go to his home for another work meeting. *Id.* ¶ 94. Figuring Katz would not act inappropriately in front of her mother or daughter, Plaintiff insisted that Katz go to Plaintiff's home instead. *Id.* Katz agreed. *Id.* When he got there, he sat on the couch in the living room and made himself at home. *Id.* ¶ 95. After Katz and Plaintiff finished working, he stayed at Plaintiff's house for an extra hour and a half watching television. *Id.*

Katz then "behave[ed] like a jealous husband" after Bousilka called Plaintiff to schedule a business dinner while he was in New York. *Id.* ¶¶ 96, 98. After Bousilka and Plaintiff spoke on the phone, she wrote in the work calendar she shared with Katz "Dinner with EB" on March 12, 2018. *Id.* ¶ 96. The day after the dinner, Bousilka called Plaintiff to tell her that Katz called him. *Id.* ¶ 97. Bousilka informed Plaintiff of Katz's call to him because Plaintiff had expressed her concerns about the relationship with Katz to Bousilka at the gala. *Id.* Katz called Bousilka to confirm whether he had dinner with Plaintiff the previous night and to ask how Bousilka could "control" her. *Id.*

Plaintiff was overwhelmed and asked Katz if they could meet at a local restaurant to talk. *Id.* ¶ 99. At the restaurant, she asked Katz if he had spoken to other people at NFN about her. *Id.* Katz admitted to speaking to Bousilka and to asking him for advice on how to control Plaintiff. *Id.* Plaintiff told Katz they could no longer work together "in the same manner." *Id.* He started to cry and then left the restaurant. *Id.* After Plaintiff left the restaurant, she called Maresca to tell him that she could no longer work with Katz because of the sexual harassment to which he subjected her. *Id.* ¶ 100. She told Maresca that the situation was anxiety-inducing but

10

Maresca ignored her sexual harassment report again. *Id.* Maresca said it was unfortunate that Plaintiff could not work with Katz anymore because their relationship was successful, businesswise. *Id.* Maresca told Plaintiff to "let [him] know what happens." *Id.*

### 3.    *Retaliation against Plaintiff*

Shortly after Plaintiff told Katz that she wanted to end their daily working relationship, she received a voicemail from the company that provided the financial planning software Plaintiff used. *Id.* ¶ 102.  The company received notice that the credit card used to pay for the software was being used illegally, and, therefore, the software was cancelled. *Id.* Katz and Plaintiff also shared many clients together and Katz began to schedule meetings with these mutual clients at times he knew Plaintiff would be unavailable. *Id.* ¶ 103.  He also did not inform Plaintiff of these meetings until a few minutes before they were scheduled to start. *Id.* Plaintiff then called the company in charge of commissions and learned that Katz "shifted their commission split for many categories from her receiving about 30% commission to 1% commission." *Id.* ¶ 104.  Katz also reassigned one of Plaintiff's clients to another financial advisor at NFN, even though Plaintiff already had the client sign an investment proposal. *Id.* ¶¶ 105-06.

### 4.    *Plaintiff's Meeting with CEO Mazzei*

In April 2018, Maresca held a meeting with Plaintiff, Katz, and CEO Mazzei to resolve the situation between Plaintiff and Katz. *Id.* ¶ 107.  Maresca's only suggestion to resolve the problem was to move Plaintiff out of the office next to Katz. *Id.* ¶ 108.  Plaintiff reported the acts of retaliation against her, particularly the commission split change and Katz's taking clients away from her. *Id.* ¶ 110.  Neither Maresca nor CEO Mazzei expressed concern about the acts of retaliation nor did they admonish Katz for his behavior or insist that Plaintiff be treated fairly.

*Id.* ¶¶ 109-110.  Plaintiff's complaints did not cause a formal investigation to be undertaken at

NFN.  *Id.* ¶ 111.  She was given no help to reestablish herself and she was cut off from support

staff because the staff she used worked for Katz.  *Id.* ¶ 112.  She was shunned by co-workers and

lost many clients to reassignment.  Meanwhile, Katz's business continued to be successful.  *Id.*

¶¶ 112-13.

### 5.    *Plaintiff's Formal Complaint of Sexual Harassment and the Resulting Investigation by NFN's Outside Counsel*

On June 12, 2018, Plaintiff contacted NFN's Director of Operations, Veronica Chang, to

make a formal complaint of sexual harassment against Katz.  *Id.* ¶ 114.  Plaintiff told Director

Chang that Katz called Plaintiff "Mrs. Katz," kissed her, and insisted she go to his home after

hours to work.  *Id.* ¶ 115.  Director Chang told Plaintiff that she "thought that it was mutual."  *Id.*

After Plaintiff said it was not, Director Chang challenged Plaintiff by mentioning that Katz

picked up Plaintiff's daughter from dance class sometimes.  *Id.*  Director Chang informed

Plaintiff that NFN's outside counsel would contact Plaintiff to schedule an interview.  *Id.* ¶ 118.

Director Chang then asked Plaintiff to sign a "retransition" agreement to govern the separation of

Plaintiff and Katz's business relationship.  *Id.* ¶ 116.  The agreement provided that NFN would

continue to pay Plaintiff, but that her entire draw had to be paid back in full to NFN by February

2019.  *Id.*  The agreement did not provide compensation to assist Plaintiff in her transition from

working alongside a successful producer to working on her own.  *Id.*  The agreement also

required that any potential business from Katz's current clients had to be referred back to him.

*Id.*  Plaintiff could not believe that she was being asked to sign "such an inequitable and one-

sided agreement."  *Id.*  That same month, Plaintiff did not receive her regular draw on her pay

date and she thought this was an attempt by Director Chang and NFN to coerce her into signing

the retransition agreement.  *Id.* ¶ 117.

When Plaintiff was interviewed by NFN's outside counsel, she provided them with a list of witnesses including her family members, her friend Natasha, and Bousilka.  *Id.* ¶ 122.  She also "reported extensive details about the egregious sexual harassment she had endured, including details about Defendant Katz's *quid pro quo* offers to support her and her daughter if she engaged in a romantic/sexual relationship with him."  *Id.* ¶ 121.  However, none of these details were written in the final report nor were key witnesses such as Bousilka interviewed.  *Id.* ¶¶ 121, 124.  Although the final report confirmed that Katz kissed or attempted to kiss Plaintiff, the report concluded that Plaintiff was not subjected to a hostile work environment and that there was no unlawful harassment or retaliation.  *Id.* ¶ 123.  The report recommended that Katz receive one-on-one in-person workplace harassment training and that he refrain from conducting work meetings at his home.  *Id.* ¶ 125.

### 6.    *Events following the Outside Counsel Investigation*

At no point did NFN pair Plaintiff with another senior financial advisor.  *Id.* ¶ 128.  She began to struggle financially due to the Defendants' actions and to suffer from extreme anxiety.  *Id.* ¶¶ 127, 129.  Throughout the Summer and Fall of 2018, Plaintiff tried as best as she could to work despite the difficulties she had facing and working with her colleagues "after it became clear that . . . NFN adopted and promoted the idea of a consensual relationship gone bad."  *Id.* ¶ 129.  In November 2018, Plaintiff emailed Maresca with a psychologist's note and requested the reasonable accommodation of working remotely due to her anxiety.  *Id.* ¶ 130.  Nobody from NFN ever contacted Plaintiff about her accommodation request.  *Id.* ¶ 131.  Plaintiff collected the rest of her draw but has had no income since the expiration of her draw.  *Id.* ¶ 132.  She has earned no commissions since March 2018 and NFN has demanded that she pay back the balance of her draw.  *Id.*  The amount of the balance is not alleged.

13

In September 2019, without first contacting Plaintiff, NFN packed up her office belongings and sent them to her brother's house.  *Id.* ¶ 134.  As of the filing of the Complaint, Plaintiff is still employed by NFN but earns no income, has no sales, no commissions, and no support from NFN.  *Id.* ¶ 135.

### 7.    *NFN's Failure to Pay Plaintiff Overtime Compensation*

Lastly, the Complaint alleges that from November 2017 to March 2018, Plaintiff "regularly worked over 40 hours each week" and "typically worked 60 hours a week." *Id.* ¶¶ 136-37.  Plaintiff alleges that she was "misclassified . . . as exempt from overtime laws and instead paid . . . a bimonthly draw that she would have to repay," which did not pay her "premium overtime pay for all hours she worked over 40 per week."  *Id.* ¶¶ 142-43.  She also alleges that Defendants failed to keep accurate records of the hours she worked and failed to provide her with "an accurate statement of wages listing hours worked, rates paid, gross wages, allowances and deductions taken, and net wages paid for each workweek."  *Id.* ¶¶ 144-45.

### B.    Procedural Background

Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on March 20, 2019.  *See* Compl. ¶ 7.  She received a Notice of Right to Sue on February 3, 2020.  *Id.*  The instant case was commenced on April 29, 2020 with the filing of the Complaint.  *See generally id.*  The Complaint asserts five causes of action:  (1) gender discrimination pursuant to Title VII and the NYSHRL against NFN; (2) retaliation pursuant to the NYSHRL against Katz; (3) failure to pay overtime pursuant to the FLSA against NFN; (4) failure to pay overtime pursuant to the NYLL against NFN; and (5) failure to provide accurate wage statements pursuant to the NYLL against NFN.  *See id.* ¶¶146 -79.  On September 25, 2020, Defendant NFN filed a motion to dismiss Counts Three, Four, and Five of the Complaint

which pertained to Plaintiff's claims of FLSA and NYLL violations.  *See* Def. NFN's Mem. at 1.

On September 28, 2020, NFN's motion to dismiss was referred to this Court for a Report and

Recommendation.  *See* September 28, 2020 Electronic Order.

### C.    The Parties' Positions

#### 1.    *NFN's Motion*

First, NFN argues that Plaintiff's claims which are brought under the FLSA and NYLL

must fail because Plaintiff has not alleged that NFN is her "employer" as defined by those two

statutes.  *See* Def. NFN's Mem. at 4-7.  In support of this argument, NFN cites the "Field

Representative Agreement" (the "FR Agreement") which Plaintiff signed with the Guardian Life

Insurance Company of America on October 29, 2017.  *See id.* at 2, 5-6.  The FR Agreement was

not attached as an exhibit to the Complaint, but NFN claims that the Agreement is integral to it.

*Id.* at 5.  Specifically, NFN argues that the Agreement demonstrates that Plaintiff contracted with

Guardian on a "full-time basis" and that Guardian paid her, thus making Guardian the Plaintiff's

employer.  *Id.* at 6.  Alternatively, NFN argues that the Complaint is "devoid of meaningful

allegations that NFN was Plaintiff's 'employer' under the FLSA or the NYLL.  *Id.*

Next, even if the Court were to find that Plaintiff adequately alleged NFN to be her

"employer," NFN argues that Plaintiff is exempt from overtime compensation under both the

FLSA and NYLL as a highly compensated employee.  *Id.* at 7.  NFN draws the Court's attention

to Plaintiff's allegation which provides that she earned compensation of $10,000 per month.

*Id.* at 8 (citing Compl. ¶ 28).  NFN then argues that Plaintiff's position as a financial advisor and

the duties she performed likewise render her exempt pursuant to the highly compensated

employee exemption.  *Id.* at 9-10.

According to NFN, Plaintiff's claims for overtime compensation lack factual specificity. *Id.* at 11-13. NFN submits that the Complaint "is precisely the kind of threadbare complaint that fails to state a plausible claim for overtime compensation under the Second Circuit's pleading standards." *Id.* at 12.  NFN maintains that the Complaint does not provide sufficient detail about the length and frequency of Plaintiff's unpaid work to support an inference that she worked more than 40 hours in a given week. *Id.*  Lastly, NFN argues that Plaintiff should not be granted leave to amend the Complaint because "no amendment could cure the fact that NFN was not Plaintiff's 'employer' under the FLSA or the NYLL or the fact that Plaintiff was exempt from overtime compensation." *Id.* at 13.

## 2. *Plaintiff's Opposition*

At the outset, Plaintiff contends that the FR Agreement is not integral to the Complaint and should not be considered by the Court in ruling on the motion to dismiss. *See* Pl.'s Opp'n at 1-3.  Plaintiff then argues that NFN was her "employer" under the FLSA and NYLL because NFN hired and constructively terminated her, had full control of her compensation, and determined the conditions of her employment, *i.e.*, where her office was located. *Id.* at 4-5. Next, Plaintiff asserts that she is a non-exempt employee pursuant to the FLSA and NYLL based upon three allegations in the Complaint:  (1) Plaintiff's primary duty was to sell Guardian Life Insurance products to current and new clients of NFN; (2) Plaintiff did not exercise discretion or independent judgment as to matters of significance at NFN; and (3) Defendants misclassified Plaintiff as exempt from overtime laws and paid her a bimonthly set draw that she would have to repay. *See id* at 5-7 (citing Compl. ¶¶ 138, 140, 142).

Plaintiff opposes NFN's argument that she is a "highly compensated" employee. Plaintiff's recoverable draw was deducted from her commissions and therefore she does not meet

the salary basis test.  *Id.* at 7.  Plaintiff then notes that "[i]t has been hotly contested in litigation whether financial advisors are entitled to overtime" and that her claims should be permitted to proceed to discovery.  *Id.* at 8.  Further, Plaintiff maintains that the Complaint sufficiently pleads that she worked in excess of 40 hours per week.  *Id.* at 9 (citing Compl. ¶¶ 136-37).

Finally, and as an alternative form of relief should the Court grant NFN's motion to dismiss, Plaintiff requests leave to amend the Complaint.  *See id.* at 10.  In support of this request, Plaintiff states that she "has within her possession additional documents and facts which can be plead to prove that Defendant NFN is her employer, such as the transition agreement. Plaintiff can also provide additional documents and facts to prove that she is non-exempt from overtime and Plaintiff can plead with more specificity and provide documents regarding hours she worked over 40 per workweek." *Id.* at 10.  The Court notes that no proposed amended pleading was attached to Plaintiff's opposition.

### 3.     *NFN's Reply*

To the extent that Plaintiff cites paragraphs 136 and 137 of the Complaint to demonstrate plausible claims for overtime compensation, NFN contends that those allegations are insufficient as a matter of law because they do not provide the requisite detail about the length and frequency of Plaintiff's unpaid work.  *See* Def. NFN's Reply at 2-4.  NFN then argues that the FR Agreement is integral to the Complaint and should be considered by the Court because there are allegations in the Complaint which rely heavily on the terms and effect of the FR Agreement.  *Id.* at 4-5.  In particular, NFN contends that the allegations concerning Plaintiff's relationship with Guardian, her work selling Guardian products, and her compensation arrangement with Guardian warrant the Court's consideration of the Agreement.  *Id.* at 5.

NFN then addresses Plaintiff's arguments regarding the application of the highly compensated employee exemption. *See id.* at 6-8.  Although Plaintiff argues that "recoverable draw" compensation does not meet the salary basis test, NFN submits that Plaintiff mischaracterized the one district court opinion she relies upon in support of that argument. *See id.* at 6.  Notwithstanding this factor, NFN contends that the Complaint alleges Plaintiff was paid a salary, and that her compensation was paid as a regular and predetermined amount. *Id.*  NFN then reiterates its argument that the duties Plaintiff carried out as a financial advisor demonstrate that she meets the exempt duties prong of the highly compensated employee exemption. *Id.* at 7-8.  Ultimately, NFN argues that leave to amend the Complaint would be futile because no amendment could cure the fact that NFN was not Plaintiff's employer nor the fact that Plaintiff is exempt from overtime compensation. *Id.* at 9.

## III.   STANDARD OF REVIEW

In deciding a motion to dismiss pursuant to Rule 12(b)(6), the Court must liberally construe the claims, accept all factual allegations in the complaint as true, and draw all reasonable inferences in favor of the plaintiff. *See Aegis Ins. Servs., Inc. v. 7 World Trade Co., L.P.*, 737 F.3d 166, 176 (2d Cir. 2013) (quotations and citation omitted); *Grullon v. City of New Haven*, 720 F.3d 133, 139 (2d Cir. 2013).  The plaintiff must satisfy "a flexible 'plausibility standard.'" *Iqbal v. Hasty*, 490 F.3d 143, 157 (2d Cir. 2007), *rev'd on other grounds sub nom. Ashcroft v. Iqbal*, 556 U.S. 662 (2009).  "[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 546 (2007).  The Court, therefore, does not require "heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." *Id.* at 570; *see also Operating Local 649 Annuity Trust Fund v. Smith*

*Barney Fund Mgmt. LLC*, 595 F.3d 86, 91 (2d Cir. 2010) (holding that a complaint must set forth "a plausible set of facts sufficient 'to raise a right to relief above the speculative level.'") (quoting *Twombly*, 550 U.S. at 555).

The Supreme Court clarified the appropriate pleading standard in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), in which the court set forth a two-pronged approach to be utilized in analyzing a motion to dismiss. District courts are to first "identify [ ] pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* at 679; *see also id.* at 678 ("A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'") (quoting *Twombly*, 550 U.S. at 555). Though "legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id*. Second, if a complaint contains "well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a [d]efendant has acted unlawfully." *Id.* at 678 (citing *Twombly*, 550 U.S. at 556-57) (internal citations omitted).

In adjudicating a Rule 12(b)(6) motion to dismiss, the Court must limit itself to facts alleged in the complaint, which are accepted as true; to documents attached to the complaint as exhibits or incorporated in the complaint by reference; to matters of which judicial notice may be taken; or to documents whose terms and effect are relied upon heavily in the complaint and, thus, are rendered "integral" to the complaint. *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152–53 (2d Cir. 2002); *see also ASARCO LLC v. Goodwin*, 756 F.3d 191, 198 (2d Cir. 2014).

## IV.   DISCUSSION

### A.   Plaintiff's Overtime Compensation Claims

#### 1.   *Applicable Law*

To adequately plead a claim for overtime wages under the FLSA, a plaintiff-employee must allege the following facts regarding his/her relationship with an alleged employer-defendant:  "(1) the Defendant is an enterprise participating in commerce or the production of goods for the purpose of commerce; (2) the Plaintiff is an 'employee' within the meaning of the FLSA; and (3) the employment relationship is not exempted from the FLSA."  *Rodriguez v. Ridge Pizza Inc.*, No. CV 16-254, 2018 WL 1335358, at *5 (E.D.N.Y. Mar. 15, 2018) (quoting *Garcia v. Badnya*, No. 13-CV-4021, 2014 WL 4728287, at *5 (E.D.N.Y. 2014)).  A plaintiff-employee must also sufficiently allege "40 hours of work in a given workweek as well as some uncompensated time in excess of the 40 hours."  *Id.* (quoting *Lundy v. Catholic Health Sys. of Long Island, Inc.*, 711 F.3d 106, 114 (2d Cir. 2013)).

As to the first element, *i.e.*, whether the defendant is an enterprise engaged in commerce or in the production of goods for commerce, the defendant is an "enterprise" where it

> has employees engaged in commerce or in the production of goods for commerce, or that has employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person; and . . . whose annual gross volume of sales made or business done is not less than $500,000.

29 U.S.C. § 203(s)(1)(A).

With respect to the second element of an FLSA overtime claim, courts examine the "economic realities" of a working relationship to determine whether a plaintiff is an employee under the FLSA.  *See Rojas v. Splendor Landscape Designs Ltd.*, 268 F. Supp. 3d 405, 410 (E.D.N.Y. 2017) (citing *Irizarry v. Catsimatidis*, 722 F.3d 99, 104 (2d Cir. 2013)).  Courts look to the following factors to determine the economic realities of a plaintiff's circumstance:

> (1) the degree of control exercised by the employer over the workers, (2) the workers' opportunity for profit or loss and their investment in the business, (3) the degree of skill and independent initiative required to perform the work, (4) the permanence or duration of the working relationship, and (5) the extent to which the work is an integral part of the employer's business.

*Rodriguez*, 2018 WL 1335358, at *6 (citing *Tackie v. Keff Enter.*, No. 14-CV-2074, 2014 WL 4626229, at *2 (S.D.N.Y. Sept. 16, 2014)). No one of these factors is dispositive. *Id.* In evaluating these factors, "[t]he ultimate concern is whether, as a matter of economic reality, the workers depend upon someone else's business for the opportunity to render service or are in business for themselves." *Id.* (quoting *Tackie*, 2014 WL 4626229, at *2).

Lastly, as to the third element, the FLSA exempts certain categories of employees from the time-and-a-half overtime requirement. Relevant here, one of these exemptions is the "highly compensated employees" ("HCE") exemption. *Tilchen v. Cemd Elevator Corp.*, No. 17 CIV. 51, 2019 WL 4640184, at *4 (S.D.N.Y. Sept. 24, 2019) (citing 29 C.F.R. § 510.601), *appeal withdrawn*, 2020 WL 1907542 (2d Cir. Feb. 12, 2020). To qualify for the HCE exemption, an employee must: (1) have total annual compensation of at least $107,432; (2) "customarily and regularly perform[] any one or more of the exempt duties or responsibilities of an executive, administrative, or professional employee"; and (3) have a primary duty including the performance of office or non-manual work. *See* 29 C.F.R. § 506(a)(1), (d); *Bellone v. Kraft Power Corp.*, No. 15-CV-3168, 2016 WL 2992126, at *4 (E.D.N.Y. May 23, 2016). "On a motion to dismiss, a defendant bears the burden of establishing that, on the face of the complaint, the plaintiff was an exempt employee." *Granda v. Trujillo*, No. 18 CIV. 3949, 2019 WL 367983, at *8 (S.D.N.Y. Jan. 30, 2019) (citing *Chen v. Major League Baseball*, 6 F. Supp. 3d 449, 454 (S.D.N.Y. 2014)).

2.      *Application*

Defendant NFN's argument is three-fold:  (1) NFN is not Plaintiff's "employer"; (2) Plaintiff is exempt from overtime compensation as a "highly compensated employee"; and (3) Plaintiff has failed to plausibly allege that she worked 40 hours per week as well as time she was not compensated for in excess of those 40 hours.[2]  The Court will address each of Defendant's arguments in turn.

a.      **Whether NFN is Plaintiff's "Employer"**

i.      *The FR Agreement*

NFN first argues that it is not Plaintiff's employer because the FR Agreement provides that Guardian contracted with Plaintiff on a full-time basis and would pay Plaintiff a salary, incentive compensation, and commissions.  *See* Def. NFN's Mem. at 5-6.  Without explicitly saying so, it appears that Defendant NFN is arguing that Guardian is Plaintiff's employer for purposes of the FLSA.  Notwithstanding, although the FR Agreement is not attached as an exhibit to the Complaint, NFN requests that the Court consider the document because it is integral to the Complaint.  *Id.*  Plaintiff on the other hand contends that the FR Agreement is not integral to the pleading.  *See* Pl.'s Opp'n at 1-2.

A document is integral to the complaint where the plaintiff (1) has actual notice of the document and its information and (2) has "relied upon the[] documents in framing the complaint."  *McLennon v. City of New York*, 171 F. Supp. 3d 69, 89 (E.D.N.Y. 2016) (citing *Chambers*, 282 F.3d at 153)).  Defendant argues that the FR Agreement is the "core contractual document underlying Plaintiff's relationship with Guardian" and that the Complaint "contains

---

[2]      Defendant NFN has not argued that Plaintiff has failed to plausibly allege the first element of an FLSA overtime claim.

extensive allegations concerning Plaintiff's relationship with Guardian and her work selling

Guardian products." *See* Def. NFN's Mem. at 5.  Pursuant to the FR Agreement, which is

located at DE 20-3, Guardian agreed to pay Plaintiff a salary of $3,000 per month, payable in

equal installments two times per month.  *See* Guardian Field Representative Agreement ("FR

Agreement") [DE 20-3] at ¶ 4.  The FR Agreement also provides that Plaintiff would be paid

"any incentive compensation earned and payable to [her] according to the Field Representative

Plan" as well as commission payments as per the Field Representative Plan for individual

annuity business.  *Id.* at ¶¶ 5-6.[3]

The Guardian compensation scheme as set forth in the terms of the FR Agreement is

different from the terms of compensation that Defendant NFN and Plaintiff agreed to as per the

Complaint, which provided for "[f]ixed compensation of $10,000 per month that consisted of

two draws."  *See* Compl. ¶ 28(a).  Although one of those draws was for $5,000 per month from

Guardian, Plaintiff received a second $5,000 draw per month from Defendant NFN.  *Id.*  In

addition to those two draws, Plaintiff also received commissions for the "insurance and financial

planning products" that she sold.  *Id.* ¶ 28(b).  This indicates to the Court that Plaintiff received

commissions not only for life insurance products such as those provided by Guardian, but for

other financial products as well.  While Guardian may have provided some portion of Plaintiff's

overall compensation, it was purportedly not the Plaintiff's only source of income.  Moreover,

although the FR Agreement may be relevant to Plaintiff's allegations, the relevancy of the

contents of a document not incorporated into a complaint is not enough for the document to be

deemed "integral" for purposes of a motion to dismiss.  *See McLennon*, 171 F. Supp. 3d at 89

("[A] document is not 'integral' simply because its contents are highly relevant to a plaintiff's

---

[3]        The Court was not provided with the "Field Representative Plan."

allegations, but only when it is clear that the plaintiff *relied* on the document in preparing his

complaint." (quoting *Williams v. City of New York*, No. 14-CV-5123, 2015 WL 4461716, at *2

(S.D.N.Y. July 21, 2015)).  For these reasons -- and based upon the Court's review of the

Complaint and FR Agreement which is between Plaintiff and Guardian, a non-party to this

action -- it is not clear to the Court that the Plaintiff relied upon the FR Agreement in drafting the

Complaint.  *See id.*  Thus, the Court does not find the FR Agreement integral to the Complaint

and will not consider it for purposes of this motion to dismiss.  As a result, to the extent that the

Defendant NFN argues it is not Plaintiff's employer based upon the FR Agreement, those

arguments are not germane here.

### ii.    *Economic Realities Test*

Defendant NFN next argues that Plaintiff failed to allege sufficient facts to meet the

economic realities test in order to demonstrate that NFN is her employer.  *See* Def. NFN's Mem.

at 6.  "The heart of the matter is the extent to which the alleged employer possesses control over

the worker[] in question."  *Sapia v. Home Box Off., Inc.*, No. 18 CIV. 1317, 2018 WL 6985223,

at *5 (S.D.N.Y. Dec. 17, 2018) (citing *Herman v. RSR Sec. Serv. Ltd.*, 172 F.3d 132, 135 (2d Cir.

1999)).  To examine the level of control, courts consider the four *Carter* factors which pertain to

"whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised

and controlled employee work schedules or conditions of employment, (3) determined the rate

and method of payment, and (4) maintained employment records."  *Irizarry v. Catsimatidis*, 722

F.3d 99, 105 (citing *Carter v. Dutchess Community Coll.*, 735 F.2d 8, 12 (2d Cir. 1984)).  Of

note, with respect to the issue of whether the Defendant meets the economic realities test, the

*Carter* factors are the sole elements discussed by the parties in their motion papers.

The Complaint generally alleges that "Defendant NFN maintained control, oversight, and direction over" its employees, employment practices, and operations.  *See* Compl. ¶¶ 13, 16. More specifically in terms of the first *Carter* factor, the Complaint alleges that Plaintiff was hired by NFN because Plaintiff (1) interviewed at NFN for a job opening at NFN and (2) was offered a compensation package by NFN and attempted to re-negotiate its terms prior to acceptance with Michael Maresca, the Associate General Agent of NFN.  *Id.* ¶¶ 22, 24, 28, 32. To the extent that Plaintiff contends in her Opposition that she was also constructively terminated by Defendant NFN, *see* Pl.'s Opp'n at 23, the Complaint also states that she is "allegedly currently still employed by Defendant NFN . . . but for all intents and purposes has long been effectively terminated."  *See* Compl. ¶ 135.

Regarding the second and third *Carter* factors, Plaintiff argues that Defendant NFN "had full control over her compensation and determined the conditions of her employment, including where her office was located."  *See* Pl.'s Opp'n at 4.  Plaintiff does not touch upon the issue of Defendant NFN's control of her work schedule in either the Complaint or her Opposition.  The only allegations which pertain to any purported work schedule are those which describe instances where Defendant Katz asked Plaintiff to go to his house "after hours" to work.  There is no indication as to when Plaintiff's workdays began or ended, or if her day-to-day schedule was set by Defendant NFN.  With respect to the method of payment, it is clear from the Complaint that Plaintiff maintains Defendant NFN determined how she was compensated, *i.e.*, the amount of the draws she received each month and the commissions she was entitled to receive.  Lastly, as to the fourth *Carter* factor, the Complaint does allege, albeit sparsely, that "Defendant NFN maintained timekeeping, payroll and other employment practices that applied to [its employees, including Plaintiff]."  *See* Compl. ¶¶ 16-17.

25

Significantly, NFN has not specifically argued that the Plaintiff is an independent contractor, a type of worker not covered by the FLSA or NYLL. *See Taveras v. HRV Mgmt., Inc.*, No. 17-CV-5211, 2020 WL 1501777, at *5 (E.D.N.Y. Mar. 24, 2020). Realistically, Defendant's arguments do not weigh in on the legal sufficiency of the Plaintiff's allegations regarding the employee-employer relationship here other than to assert that the allegations are too "boilerplate," "formulaic," or "devoid of factual detail." *See* Def. NFN's Mem. at 6-7. On this point, Defendant NFN has not argued that Plaintiff, as a financial advisor, is "[a] skilled worker [who] is more likely to be an independent contractor." *See Stack v. Karr-Barth Assocs., Inc.*, No. 18-CV-10371, 2021 WL 1063389, at *4 (S.D.N.Y. Mar. 18, 2021) (finding a financial planner to be an independent contractor under the FLSA based upon the individual's level of expertise and experience). Nor has Defendant argued that Plaintiff does not depend upon NFN for business to perform her financial advising services. *See Tackie*, 2014 WL 4626229, at *2. Although Plaintiff is in part responsible for soliciting new referrals, *see* Compl. ¶ 35, the Complaint otherwise alleges that Plaintiff relied upon Defendant NFN -- and consequently Katz -- for clients and the tools she needed to perform her job.   In light of the totality of the circumstances here, the Court finds that, at the motion to dismiss stage, the Complaint plausibly alleges an employee-employer relationship.

**b.    Highly Compensated Employee Exemption**

The primary dispute between the parties is whether Plaintiff is exempt from the FLSA as a highly compensated employee. As set forth above, to qualify for the HCE exemption, an employee must: (1) have total annual compensation of at least $107,432; (2) customarily and regularly perform one or more of the exempt duties or responsibilities of an executive,

administrative, or professional employee; and (3) have a primary duty including the performance of office or non-manual work.  *See* 29 C.F.R. § 506(a)(1), (d); *Bellone*, 2016 WL 2992126, at *4.

As to the first element, Defendant argues that the Plaintiff earned compensation of "$10,000 per month—*i.e.*, $120,000 per year" which exceeds $107,432 annually.  *See* Def. NFN's Mem. at 8 (citing Compl. ¶ 28).  Defendant further submits "there is no dispute that she earned in excess of $107,432 annually."  *Id.* (citing 29 C.F.R. § 541.601(a)).  Plaintiff on the other hand submits that her "compensation was a recoverable draw, which does not meet the salary basis [test] as it was deducted from earned commissions."  *See* Pl.'s Opp'n at 4.  In support of this argument, Plaintiff cites *Sexton v. Franklin First Financial Ltd.*, 08 Civ. 04950, 2009 WL 1706535, at *4 (E.D.N.Y. June 16, 2009).  However, the issue of whether a recoverable draw meets the salary basis test was not before the court in Sexton.  Rather, the court in *Sexton* was reviewing a motion for conditional certification of an FLSA collective composed of loan officers.  *See id.* at *4.  In its summary of the plaintiffs' memorandum of law, the court stated the following:

> According to plaintiff and opt-in plaintiffs, by paying these employees on primarily a commission-only basis, with no guaranteed salary, loan officers generally were not paid anything unless they made a sale. Although "a few loan officers did periodically receive a bi-weekly 'draw', this amount did not total at least $455 . . . and therefore did not satisfy the salary basis test for an exemption as a matter of law." (Plaintiff's Memorandum of Law, at 3; *see also* Plaintiff's Exh. C ¶ 6.) Moreover, plaintiff claims that even assuming such draws totaled more than $455 per week, such "recoverable draws" do not meet the salary basis test, as they were deducted from any commissions earned. (Plaintiff's Memorandum of Law, at 3–4)

*Id.* (alteration in original) (internal citation omitted).  Plaintiff's citation to this portion of the *Sexton* decision is misleading and is neither authoritative nor persuasive on the question of whether a recoverable draw meets the salary basis test as a matter of law.

Notwithstanding this misplaced reliance, the Court notes that the $10,000 in draws which Plaintiff received each month is composed of two $5,000 draws, one from Guardian and one from Defendant NFN.  The Defendant has not cited a single case where the alleged employer combined the compensation it paid to a plaintiff with the compensation the plaintiff received from another source of income for purposes of demonstrating that the HCE exemption applies. Therefore, to the extent that Defendant argues the Plaintiff's draws constituted her "salary," the Court will only consider the $5,000 draw paid by Defendant NFN to Plaintiff.  Thus, if the Court were to calculate Plaintiff's annual compensation utilizing only this $5,000 draw, Plaintiff's annual compensation is $60,000 -- which is far less than the $107,432 that is required pursuant to 29 C.F.R. § 541.601(a)(1).  Although the Plaintiff also received commissions, Defendant NFN does not argue that the amount of commissions Plaintiff received should be taken into consideration for purposes of the HCE exemption.  For these reasons, the Court finds that the HCE exemption does not apply because the Defendant has not met its burden to demonstrate that it does.[4]

### c.      Hours in Excess of 40

Defendant's next basis for dismissal is that Plaintiff has not sufficiently alleged that she worked 40 hours in a given workweek as well as overtime in excess of those 40 hours.  *See* Def. NFN's Mem. at 10-14.  In support of this argument, the Defendant cites a trio of Second Circuit decisions that are often relied upon when evaluating the sufficiency of pleadings for FLSA

---

[4]      The Court notes Defendant NFN has not raised an argument that Plaintiff is exempt from the FLSA pursuant to 29 C.F.R. § 541.600 because she is "an exempt administrative or professional employee . . . compensated on a salary basis at a rate of not less than $684 per week," $1,368 bi weekly, or $1,482 semimonthly.  *See* 29 C.F.R. § 541.600(a)-(b). The only exemption that Defendant contends is applicable here is the highly compensated employee exemption.

overtime claims.  *See DeJesus v. HF Mgmt. Servs., LLC*, 726 F.3d 85 (2d Cir.2013); *Nakahata v. N.Y.-Presbyterian Healthcare Sys., Inc.*, 723 F.3d 192 (2d Cir.2013); *Lundy v. Catholic Health Sys. of Long Island, Inc.*, 711 F.3d 106 (2d Cir.2013).  This Court has previously examined closely the pleading standards of *Lundy*, *Nakahata*, and *DeJesus* in *Tanski v. AvalonBay Communities, Inc.*  That discussion provides a helpful context here:

> In *Lundy*, the Second Circuit first addressed the "degree of specificity needed to state an overtime claim under the FLSA." 711 F.3d at 114. The court in *Lundy* wrote that "to survive a motion to dismiss, Plaintiffs must allege sufficient factual matter to state a plausible claim that they worked compensable overtime in a workweek longer than 40 hours." *Id.* Noting "the degree of specificity needed to state an overtime claim under the FLSA" was a question of first impression, the court provided the following benchmark: "in order to state a plausible FLSA overtime claim, a plaintiff must sufficiently allege 40 hours of work in a given workweek as well as some uncompensated time in excess of the 40 hours." *See id.* (citing 29 U.S.C. § 207(a)(1)).  In affirming dismissal of the complaint, the *Lundy* court found "no plausible claim that [the] FLSA was violated, because Plaintiffs have not alleged a single workweek in which they worked at least 40 hours and also worked uncompensated time in excess of 40 hours." *Id.*  For example, one of the plaintiffs alleged that she "was 'typically' scheduled to work three shifts per week, totaling 37.5 hours." *Id.*  Although the plaintiff had alleged that she "occasionally" worked in excess of forty hours, "how occasionally or how long, she does not say; nor does she say that she was denied overtime pay in any such particular week." *Id.* at 114–15. Another plaintiff similarly failed to allege "that she was denied overtime pay in a week where she worked ... additional shifts." *Id.* at 115. The Second Circuit explained that allegations regarding "typical" practices fall short of the requisite specificity because such claims "invite[ ] speculation" as to whether the plaintiff worked more than forty hours in any given week. *Id.* The Second Circuit therefore affirmed the dismissal of the plaintiffs' FLSA overtime claims. *Id.*
>
> In *Nakahata*, the Second Circuit reiterated the standard articulated in *Lundy*, affirming dismissal of overtime claims in which the plaintiffs "merely alleged that they were not paid for overtime hours worked." 723 F.3d at 201. The Second Circuit explained that the plaintiffs' perfunctory allegations that they were not compensated for work performed during meal breaks, before and after shifts, or

during required trainings "raise the possibility that Plaintiffs were undercompensated in violation of the FLSA and NYLL; however, absent any allegation that Plaintiffs were scheduled to work forty hours in a given week, these allegations do not state a plausible claim for such relief." *Id.* The court in *Nakahata* therefore held that the "Plaintiffs failed to plead sufficient facts to make it plausible that they worked uncompensated hours in excess of 40 in a given week." *Id.*

Finally, in *DeJesus*, the Second Circuit affirmed dismissal of a claim for FLSA overtime where the plaintiff "provided less factual specificity than did the plaintiffs in *Lundy* or *Nakahata*" in that "[s]he did not estimate her hours in any or all weeks or provide any other factual context or content." 726 F.3d at 89. Rather, the plaintiff "alleged only that in 'some or all weeks' she worked more than 'forty hours' a week without being paid '1.5' times her rate of compensation," and thus "no more than rephras[ed] the FLSA's formulation specifically set forth in section 207(a)(1)." *Id.* (citation omitted). The Second Circuit clarified: "*Lundy*'s requirement that plaintiffs must allege overtime without compensation in a 'given' workweek, was not an invitation to provide an all-purpose pleading template alleging overtime in 'some or all workweeks.'" *Id.* at 90 (citation omitted). The pleading standard was instead "designed to require plaintiffs to provide some factual context that will 'nudge' their claim 'from conceivable to plausible.'" *Id.* (citing *Twombly*, 550 U.S. at 570). To satisfy this standard, plaintiffs are not required to "keep careful records and plead their hours with mathematical precision"; however, the standard requires that plaintiffs provide "complaints with sufficiently developed factual allegations." *Id.*

*See Tanski v. AvalonBay Communities, Inc.*, No. CV 15-6260, 2016 WL 8711203, at *7 (E.D.N.Y. Sept. 30, 2016). "The most salient corollary from the *Lundy–Nakahata–Dejesus* triumvirate is that an FLSA plaintiff must provide a certain degree of specificity as to uncompensated hours worked during a *particular week*." *Id.* at *8 (quoting *Chime v. Peak Sec. Plus, Inc.*, 137 F. Supp. 3d 183, 196 (E.D.N.Y. 2015)).

With these principles in mind, the Court now addresses the allegations which pertain to unpaid overtime compensation. As to the number of hours Plaintiff worked, the Complaint alleges the following:

136.  From November 2017 to March 2018, Ms. Gomez regularly worked over 40 hours each week.

137.  From November 2017 to March 2018, Ms. Gomez typically worked 60 hours a week.

*See* Compl. ¶¶ 136-37.  Plaintiff further asserts that she was not paid "premium overtime pay for all hours she worked over 40 per week." *Id.* ¶ 143.  These allegations are insufficient to state a plausible FLSA claim.

"As courts in this Circuit have since observed, all that is required under *Lundy* and its progeny is '[a] blend [of] enough specific facts—the hours worked, the hours paid, the rate of pay, the employment practices at issue, and so forth—to make plausible the existence of at least one given work week of more than forty hours.'"  *See Tanski*, 2016 WL 8711203, at *9 (quoting *Anjum v. J.C. Penney Co.*, No. 13-CV-0460, 2014 WL 5090018, at *17 (E.D.N.Y. Oct. 9, 2017)).  Although Plaintiff has alleged that she "regularly worked" over 40 hours per week, there are no allegations stating what hours Plaintiff claims she was paid for or not paid for, the rate of pay she used to calculate that she was not paid overtime compensation, nor identifying one specific week that she worked in excess of 40 hours.  Courts have upheld general allegations that a plaintiff regularly worked 40 hours per week where the plaintiff has provided paystubs for "example" weeks that the plaintiff was not paid overtime or worked in excess of 40 hours, or even provided allegations regarding a specific week that was worked in excess of 40 hours.  *See id.* (finding overtime allegations specific enough where:  "(1) Plaintiff's allegations that he regularly worked 40 hours per week and was not paid overtime compensation for any non-productive hours he worked beyond 40 hours, along with (2) the paystubs showing four 'example' weeks when Plaintiff was not paid overtime for the non-productive hours worked beyond 40 per week"); *Chime*, 137 F. Supp. 3d at 197 (denying motion to dismiss overtime claims where the complaint provided examples of weeks where the plaintiff worked six or more

31

eight-hour shifts); *Morales v. Rochdale Vill. Inc.*, No. 15-CV-502, 2015 WL 6442590, at \*3 (E.D.N.Y. Oct. 23, 2015) (holding that "plaintiff's specific examples from the week of January 6, 2014, combined with her allegations regarding her regularly scheduled forty hour work week, are sufficient to 'nudge' plaintiff's overtime claim 'from conceivable to plausible' "); *Cowell v. Utopia Home Care, Inc.*, 144 F. Supp. 3d 398, 405 (E.D.N.Y. 2015) (finding *Lundy* standard satisfied where the complaint alleged that the plaintiff "regularly worked over fifty hours a week" and those allegations were "supported by the pay stubs attached to the complaint reflecting 56 hour work weeks"); *see also Mendoza v. Little Luke, Inc.* No. 14-CV-3416, 2015 WL 998215, at \*5 (E.D.N.Y. Mar. 6, 2015) ("[T]he Amended Complaint . . . approximates each Plaintiff's weekly hours at various points of his employment along with specific start and end times for each day of work[,] [and] does much more than simply 'track[ ] the statutory language of the FLSA, lifting its numbers and rehashing its formulation.' *DeJesus*, 726 F.3d at 89. Furthermore, the Amended Complaint also provides additional factual context from which the Court may infer that Defendants failed to pay proper overtime, specifically:  (1) that Reyes and Ortiz worked longer hours during Little Luke's busy seasons; and (2) that Defendants did not pay Reyes at all for his last two workweeks, one of which he alleges he worked sixty hours. Thus, the Court finds that Plaintiffs have adequately pleaded unpaid overtime claims.").

For the foregoing reasons, the Court finds that the Plaintiff has not adequately alleged a claim for overtime compensation pursuant to the FLSA.   Moreover, "[t]he relevant portions of New York Labor Law do not diverge from the requirements of the FLSA,' and the pleading standards for FLSA overtime claims 'apply equally to ... NYLL state law claims.'" *See Tanski*, 2016 WL 8711203, at \*7 (quoting *Dejesus*, 726 F.3d at 89 n.5).  On that basis, the Court also finds that Plaintiff's claim for overtime compensation pursuant to the NYLL fails.  Accordingly,

the Court  respectfully recommends to Judge Brown that Defendant NFN's motion to dismiss be granted with respect to Plaintiff's FLSA claim for overtime compensation.

### B.      Failure to Provide Wage Statements

Defendant has also moved to dismiss Plaintiff's cause of action for failure to provide proper wage statements pursuant to NYLL § 195(3).  Under NYLL 195(3), an employer must, with each payment of wages, provide an employee with a wage notice containing, *inter alia*, the rate of pay, gross wages, deductions, allowances claimed as part of the minimum wage, and net wages. *Vazquez v. 142 Knickerbocker Enter., Corp.*, 409 F. Supp. 3d 81, 85 (E.D.N.Y. 2018). However, nowhere in Plaintiff's opposition brief does she advance an argument to save this claim.  Therefore, the Court deems Plaintiff's claim for failure to provide wage statements abandoned and recommends that it be dismissed.  *See  Peters v. City of New York*, No. 14-CV-1361, 2015 WL 3971342, at *1 (E.D.N.Y. June 30, 2015) ("Plaintiffs do not oppose defendants' motion as to those claims, and those claims are dismissed as abandoned." (citing *Newton v. City of New York*, 738 F.Supp.2d 397, 416 n. 130 (S.D.N.Y.2010))).

### C.      Leave to Amend

In her opposition to the motion to dismiss, Plaintiff briefly requests leave to amend the Complaint because she has "additional documents and facts which can be plead to prove that Defendant NFN is her employer, such as the transition agreement[,] . . . that she is non-exempt from overtime[,] . . . [and] worked over 40 [hours] per workweek."  *See* Pl.'s Opp'n at 10. Plaintiff has not made a formal motion for leave to amend her complaint in her papers.  *See Kamanou v. Exec. Sec'y of Comm'n of Econ. Cmty. of W. African States*, No. 10 Civ 7286, 2012 WL 868700, at *3 n.4 (S.D.N.Y. Mar. 14, 2012) ("[B]ecause plaintiff has not made any formal

motion for leave to amend her complaint, the Court need not address the informal request made in her Memorandum in Opposition."). The Court reserves this issue to Judge Brown.

## V.    CONCLUSION

For the foregoing reasons, the Court respectfully recommends to Judge Brown that Defendant NFN's motion dismiss be GRANTED.

## VI.    OBJECTIONS

Pursuant to 28 U.S.C. § 636(b)(1)(c) and Rule 72 of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report and Recommendation to file written objections.  *See* FED. R. CIV. P. 6(a), (e).  Such objections by an attorney of record shall be filed with the Clerk of the Court via ECF.  **A courtesy copy of any objections filed is to be sent to the Chambers of the Honorable Gary R. Brown.  Any requests for an extension of time for filing objections must be directed to Judge Brown prior to the expiration of the fourteen (14) day period for filing objections.**  Failure to file objections will result in a waiver of those objections for purposes of appeal. *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Beverly v. Walker*, 118 F.3d 900, 901 (2d Cir. 1997), *cert. denied*, 522 U.S. 883 (1997); *Savoie v. Merchants Bank*, 84 F.3d 52, 60 (2d Cir. 1996).

SO ORDERED.

Dated: Central Islip, New York
         August 2, 2021

                                        /s/ A. Kathleen Tomlinson
                                        A. KATHLEEN TOMLINSON
                                        U.S. Magistrate Judge